Present: Carrico, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ.

CALVERT W. SIMMONS

v.  Record No. 000785     OPINION BY JUSTICE DONALD W. LEMONS
                                   April 20, 2001
MARGARET C. MILLER, ET AL.

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                   Robert W. Wooldridge, Jr., Judge

     In this appeal, we consider whether Virginia law permits

a minority shareholder in a closely held corporation to assert

individual claims, distinct from derivative claims, on behalf

of a corporation against a corporate officer or director for

breach of fiduciary duty.  We also consider the trial court's

ruling that there was insufficient evidence to sustain a claim

of statutory conspiracy pursuant to Code §§ 18.2-499 and -500

and its ruling that there was insufficient evidence of

proximate causation between the harm to the corporation and

certain alleged legal malpractice of corporate counsel.

Additionally, we consider cross-error assigned to the trial

court's refusal to set aside the jury's verdict on a

derivative claim for breach of fiduciary duty and conversion.

Finally, we examine the trial court's refusal to strike the

jury's verdict concerning a breach of an employment agreement

on the ground that the restrictive covenant in the agreement

was unnecessary to protect the employer, unduly restrictive of

the employee's rights, and contrary to public policy.

I.  Facts

Recitation of detailed facts is necessary to analysis of this unique case.  Margaret C. Miller ("Miller") was the sole officer, director, and shareholder of Las Palmas Tobacco, Ltd. ("Las Palmas"), a Virginia corporation that had exclusive rights to import and distribute Profesor Sila brand cigars on the "east coast of the United States of America."  On June 26, 1996, Miller and Calvert W. Simmons ("Simmons") entered into a Stock Subscription Agreement giving Simmons a 30% ownership interest in Las Palmas in exchange for $100 and Simmons' guarantee of a $100,000 letter of credit issued for the benefit of Las Palmas.  According to the agreement, Simmons was required to "cause Virginia Commerce Bank to expeditiously issue an irrevocable Letter of Credit for the benefit of Las Palmas to [Profesor Sila] Cigar Factor[y] in Las Palmas, Spain for the sum of $100,000. . . . The Letter of Credit shall be utilized by Las Palmas to purchase product from [Professor Sila] on terms."  Additionally, in a Shareholders' Agreement, Miller and Simmons agreed that "at a future date, they w[ould] fix a value for their shares and enter into a Cross-Purchase Agreement."

Miller testified that in early December, 1996, she presented Simmons with a cross-purchase agreement and later, in January, 1997, Miller and Maria M. Kear ("Kear"), an

attorney licensed to practice in Virginia, went to Simmons'
office to "negotiate the terms of the cross-purchase
agreement." Kear testified that she represented Miller at
this meeting and that she told Simmons that she was not
representing Las Palmas. Simmons testified that he felt that
Kear was being "very adversarial in the discussions" and asked
her to leave the meeting. Upon Kear's departure, Simmons and
Miller were unable to agree on the valuation of Las Palmas.

On January 15, 1997, Miller sent a letter to Simmons that
included an offer of $13,290.59 to buy his 30% share of Las
Palmas. Simmons responded with a letter dated January 23,
1997 in which he stated that he did not wish to sell his
shares for $13,290.59 because he felt they were "worth
considerably more than that."

On September 29, 1997, Simmons sent Miller a letter in
which, pursuant to Code § 13.1-771, he demanded inspection of
the accounting records of Las Palmas. The Las Palmas
financial records were prepared and maintained by Jeanne M.
Webb ("Webb"), an independent contractor. Simmons stated in
his letter:

> In spite of my numerous phone calls, you have
> failed and refused to communicate with me since
> April 1, 1997. Currently, I do not have any
> idea how Las Palmas is faring. In addition, it
> has come to my attention that Las Palmas may
> have transferred assets to another entity
> without any consideration whatsoever.

3

In a letter dated October 3, 1997, Miller denied that Simmons had the right to inspect the financial records and denied that Las Palmas had transferred assets to another entity.

After being denied access to the Las Palmas financial records, Simmons requested that his lawyer, Gary W. Lonergan ("Lonergan"), obtain an explanation from Kear. In October of 1997, Lonergan called Kear to request the financial records. Kear denied that Las Palmas' assets had been transferred to another entity. Kear testified that:

> Lonergan . . . told me that . . . Mr. Simmons had been told that Las Palmas Tobacco Limited has been shut down and the assets had been moved to another company. He asked me what I knew about that. And I told him I didn't know anything about it. And he said well, that's what we've been told and I'm trying to get financial records, and I told him I would call Miss Miller and ask if the company had been closed down. And I did that and I called him back and I told him Miss Miller said the company had not been closed down.

Miller told Kear that the financial documents Lonergan requested were with Anatole G. Richman ("Richman"), who was performing an evaluation of the company. When Kear called Richman, he told her that he was not finished with the evaluation because Webb had not completed her work with the financial records.

Lonergan wrote Kear on October 23, 1997 indicating that Simmons had been told by the bookkeeper that "[s]he has no

financial records [and] Las Palmas has been 'wrapped up.' "

The letter also stated:

> I believe that an explanation is in order.
> Furthermore, there is no doubt that Mr. Simmons
> is entitled to see the financial records of Las
> Palmas: either Maggie Miller has them or Anatole
> C. Richmond [sic] has them.  Mr. Simmons and I
> would like to see them by the close of business
> on Friday, October 31, 1997.

Five days later Kear responded in a letter:

> [P]lease be advised that I disagree "that an
> explanation is in order."
>      As I advised you on October 14, 1997, when
> the financial records and the corollary
> business evaluation are complete, I will have
> them delivered to you; I have not wavered from
> my position.  Mr. Richman's assistant advised
> me yesterday that they are not finished with
> the evaluation and Maggie Miller advised me
> yesterday that Jeanne Webb has not completed
> the financial records.  Therefore there is
> nothing for you to review at this time.  I do,
> however, hope to have these documents within
> the next two (2) weeks.

On January 27, 1998, Lonergan again sent Kear a letter requesting access to the financial records.  Lonergan testified that within a day or two of sending the letter, he received a financial report prepared by Richman and dated January 28, 1998.  The report concerned the "value of Las Palmas . . . as of February 10, 1997 [and] . . . is based on the assumption that the Company has ceased operations and is not a going concern."

Miller testified that on February 9, 1997, Las Palmas ceased doing business. According to Miller, Las Palmas terminated its business because its supplier, Profesor Sila, refused to ship any more cigars. Miller testified that Dr. Nader Bayzid ("Dr. Bayzid"), the owner of Profesor Sila, complained that an acceptable letter of credit had not been received. Thereafter, Dr. Bayzid wrote her indicating that he was not going to ship further products and that he intended to start a new company in the United States.

Kear and Miller were friends who first met in 1985. Each is godmother to one of the other's children and Miller previously had been employed as a clerical assistant in Kear's law office. Furthermore, Kear's office was in the same building as the office of Las Palmas and Kear visited Miller there.

Kear admitted that she prepared and signed the articles of incorporation for Las Palmas and was reimbursed for the incorporation fee by Las Palmas. However, Kear stated that other than the articles of incorporation and a collection matter in February of 1998, she never did any work for Las Palmas. Kear further testified that, in the summer of 1996, Miller told her that there was an additional person (Simmons) involved in ownership of Las Palmas and that her new partner

6

said that the attorney for the company had to be someone he selected.

Kear also testified that sometime after January 10, 1997, Miller asked her to file articles of organization for Las Palmas Tobacco International, L.L.C. ("International"). On February 6, 1997, Kear mailed the articles of organization to the State Corporation Commission and, on February 10, 1997, the SCC issued a certificate of organization for "Las Palmas Tobacco International, L.L.C." An unsigned "Limited Liability Company Operating Agreement" listing Miller and Profesor Sila as equal owners was maintained in Kear's files. Kear was the initial registered agent and organizer of the corporation.

According to Kear, Miller told her:

[S]he was going to use the international
company to import a lower brand cigar that was
being made in the Dominican [Republic and]
. . . they would sell the cheap ones and it was
going to be international business . . . they
were going to have their high end domestic
sales with Limited [meaning Las Palmas Tobacco,
Ltd.] and their low end international with
International [meaning Las Palmas Tobacco
International, L.L.C.].

Kear admitted that she never asked why Las Palmas could not serve this purpose, nor did she ever inquire why Simmons did not have an ownership interest in International.

Kear also admitted that she edited a letter Miller drafted to Simmons in late February of 1997. Among other edits, the following language was removed by Kear:

> You have made it extremely clear by holding out for some fairy-tale return on your no-risk, no liability, completely passive role in Las Palmas Tobacco that you do not place any value on the business relationships that I have forged with my supplier nor my role as sole employee of this entity. I wonder what might happen if I resign from this concern, liquidate the corporation and seek other opportunities.

Karim Bayzid testified that when he came to work for International in January of 1997, he saw the nameplate for Las Palmas on the door of the office. Additionally, checks payable to Karim Bayzid were written on the account of Las Palmas. Webb testified that she was not aware of any adjustments on the books of Las Palmas that reflected payments received from International for use of the office space, furniture, or equipment. Miller's testimony revealed that Las Palmas' sole supplier of cigars became the sole supplier for International and that International sold cigars to some of the customers who had previously purchased from Las Palmas.

## II. Proceedings Below

This appeal arises out of a lawsuit filed by Simmons against Miller and Kear. In a sixteen count motion for

8

judgment,[1] Simmons alleged that Miller and Kear secretly and wrongfully replaced Las Palmas with a different corporation, International.

In addition to Miller and Kear, Simmons named Karim O. Bayzid, Dr. Nader Bayzid, Profesor Sila Cigars, and Profesor Sila, L.C., as defendants[2] in various counts of the motion for judgment. None of these additional defendants except Karim Bayzid responded to the motion for judgment and default judgment was entered as to them. The trial court granted Karim Bayzid's motion to strike on all counts against him and no matters on appeal involve him. Consequently, the appellees in this case are only Miller and Kear.

Simmons asserted individual claims against Miller and Kear as follows:

Count 1: Conspiracy to Injure Simmons in his Trade, Business or Profession, Code §§ 18.2-499 and 18.2-500, against Miller and Kear.

Count 2: Breach of Fiduciary Duty against Miller only.

---

[1] A derivative action is an action in equity and may not be brought on the law side of the court. However, since neither party nor the trial court recognized this deficiency, any objection is now waived. Rule 5:25. Code § 8.01-270 provides in part that, "[n]o case shall be dismissed simply because it was brought on the wrong side of the court."

[2] Karim Bayzid is employed by International. Dr. Bayzid, Karim Bayzid's father, is the owner and operator of Profesor Sila, L.C., which supplied cigars to Las Palmas and International.

Count 3: Conspiracy to Induce Breach of Fiduciary Duty against Miller and Kear.

Count 4: Fraud and Deceit against Miller and Kear.

Count 5: Conspiracy to Commit Fraud against Miller and Kear.

Simmons asserted derivative claims on behalf of Las Palmas against Miller and Kear as follows:

Count 6: Breach of the Employment Agreement against Miller only.

Count 7: Tortious Interference with the Employment Agreement against Kear only.

Count 8: Conspiracy to Induce Breach of the Employment Agreement against Miller and Kear.

Count 9: Tortious Interference with Las Palmas' Contracts and Business Relations with its Customers and Distributors against Miller only.

Count 10: Conspiracy to Interfere with Las Palmas' Contracts and Business Relations with its Customers and Distributors against Miller and Kear.

Count 11: Tortious Interference with Las Palmas' Contracts and Business Relationship with Profesor Sila Cigars against Miller only.

Count 12: Unlawful Conversion against Miller only.

Count 13:  Conspiracy to Injure Las Palmas, Code §§ 18.2-499 and 18.2-500, against Miller and Kear.

Count 14:  Breach of Fiduciary Duty against Miller only.

Count 15:  Conspiracy to Induce Breach of Fiduciary Duty against Miller and Kear.

Count 16:  Legal Malpractice against Kear only.

At the conclusion of plaintiff's case in chief, Miller's and Kear's motions to strike were granted as to Counts 4, 5, 7, and 8.  The jury returned a verdict against Miller on Counts 1, 2, 3, 6, 9, 10, 11, 12, 13, 14, and 15.  The jury returned a verdict against Kear on Counts 1, 13, and 16. After post-trial motions, the court struck the jury's verdict against Miller on Counts 1, 2, 3, 9, 10, 11, 13, and 15 and struck the jury's verdict against Kear on Counts 1, 13, and 16.  In addition to default judgments entered against Dr. Bayzid, Profesor Sila Cigars, and Profesor Sila, L.C., the trial court's final order dismissed claims against Kear and Karim Bayzid and granted judgment to Simmons in his derivative capacity on behalf of Las Palmas against Miller only.

### III.  Issues On Appeal

The issues on appeal have been considerably narrowed from those presented at trial.  Simmons contends that the trial court erred in granting Miller's motion to strike his individual claim for breach of fiduciary duty and Kear's and

11

Miller's motions to strike his individual claim for statutory conspiracy. Simmons asserts that a minority shareholder in a closely held corporation may maintain an individual claim for these causes of action. In addition, Simmons argues that the trial court erred in granting Kear's and Miller's motions to strike his derivative claim of statutory conspiracy because he contends that he presented sufficient evidence that they conspired to injure Las Palmas in violation of Code §§ 18.2-499 and -500. Finally, Simmons contends that the trial court erred in granting Kear's motion to strike his derivative claim of legal malpractice because he presented sufficient evidence that Kear's negligence proximately caused injury to Las Palmas.

Kear assigns no cross-error and urges this Court to affirm the rulings of the trial court. Miller assigns three cross-errors. First, Miller contends that the trial court erred in failing to strike Simmons' derivative claim of breach of fiduciary duty on the ground that there was insufficient evidence to support that claim. Miller also claims that the trial court erred in denying her motion to strike the breach of the employment agreement claim on the ground that the non-compete clause was contrary to public policy, unnecessary to protect the employer, and unduly restrictive of the employee's rights. Finally, Miller argues that the trial court erred in

failing to strike the conversion claim because the evidence was insufficient to support that claim.

## IV.  Standard of Review

We review the trial court's decision to grant or deny the motions to strike the evidence and set aside the jury's verdict in accordance with well-established principles.

> Where the trial court has set aside a jury verdict, that verdict is not entitled to the same weight as a verdict which has been approved by the trial court.  Nevertheless, this Court will accord the party who received the verdict the benefit of all substantial conflict in the evidence, as well as all reasonable inferences that could be drawn therefrom.  However, if a jury necessarily has reached its conclusions based on speculation and conjecture, the plaintiff's case fails.

O'Brien v. Everfast, Inc., 254 Va. 326, 330 491 S.E.2d 712, 714 (1997) (citations and internal quotation marks omitted).

## V.  Analysis

### A.  Breach of Fiduciary Duty

Simmons maintains that a shareholder in a closely held corporation is not confined to a derivative action on behalf of the corporation to redress claims against a corporate officer or director for breach of fiduciary duty to the corporation.  Rather, Simmons contends that the shareholder may sue individually and representatively, and if "double recovery" results, the claimant shareholder should be permitted to elect between remedies.  The jury returned

13

verdicts in favor of Simmons individually (Count 2) in the amount of $10,000, and in his derivative capacity (Count 14) in the amount of $10,000, against Miller for breach of fiduciary duties.  Noting that upholding both verdicts "would constitute a penalty, not compensation," the trial court struck the jury verdict on the individual claim, finding "that in Virginia, claims like those Simmons brought in this case are cognizable as derivative, not individual, actions."

A derivative action is an equitable proceeding in which a shareholder asserts, on behalf of the corporation, a claim that belongs to the corporation rather than the shareholder. Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993).  Derivative suits play an "important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves."  Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 371 (1966).  See also Brown v. Bedford City Land & Improvement Co., 91 Va. 31, 38, 20 S.E. 968, 970 (1895).

The overwhelming majority rule is that an action for injuries to a corporation cannot be maintained by a shareholder on an individual basis and must be brought derivatively.  See Crocker v. Fed. Deposit Ins. Corp., 826 F.2d 347, 349 (5th Cir. 1987); Cowin v. Bresler, 741 F.2d 410, 414 (D.C. Cir. 1984); Lewis v. Chiles, 719 F.2d 1044, 1049

14

(9th Cir. 1983); Lewis v. S. L. & E., Inc., 629 F.2d 764, 768 n. 10 (2nd Cir. 1980); Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3rd Cir. 1973); Fifty States Management Corp. v. Niagara Permanent Savings & Loan Ass'n, 58 A.D.2d 177, 179 (N.Y. App. Div. 1977); Landstrom v. Shaver, 561 N.W.2d 1, 12 (S.D. 1997); Rose v. Schantz, 201 N.W.2d 593, 598 (Wis. 1972).

> The reasons underlying the general rule are that 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares.

Thomas v. Dickson, 301 S.E.2d 49, 51 (Ga. 1983).

> As one leading commentator has noted:
>
> A shareholder ordinarily cannot, as an individual as distinguished from a representative of the corporation, sue directors or other corporate officers for mismanagement, negligence or the like, on a cause of action which belongs to the corporation. The remedial rights of minority shareholders with respect to wrongs committed against the corporation by the officers and directors in the management of corporate affairs are derivative rights and any action taken by the shareholders to redress such wrongs must be for the benefit of the corporation.

15

12B William M. Fletcher, Cyclopedia of the law of Private Corporations § 5924, at 497-99 (perm. ed. 2000 rev. vol.) (citations and footnotes omitted).  See also, 1 F. Hodge O'Neal, Close Corporations § 1.02 (1971, updated 1994).

Recognizing the general rule, Simmons, nonetheless, urges the adoption of a closely held corporation exception permitting maintenance of an individual claim for breach of fiduciary duties under limited circumstances.  In Coastal Pharmaceutical Co. v. Goldman, 213 Va. 831, 837, 195 S.E.2d 848, 853 (1973), this Court noted:

> [W]e are aware of the several definitions of a "close corporation" written by various scholars on and off the bench, [but] . . . [w]e fear the most precise definition may be imperfect to every occasion, and we find it unnecessary to choose among the scholars or to write a hard and fast definition of our own.

While it is also unnecessary in this case to write such a definition because the parties agree that Las Palmas is a closely held corporation, we note that this corporation has a small number of shareholders with no active trading market for their shares, and substantial majority stockholder participation in the management, direction, and operations of the corporation.  See, e.g., Donahue v. Rodd Electrotype Co. 328 N.E.2d 505, 511 (Mass. 1975); see Masinter v. WEBCO Co., 262 S.E.2d 433, 435 (W.Va. 1980).

16

A number of states permit an individual claim under the following principle advocated by the American Law Institute:

> In the case of a closely held corporation [§ 1.06], the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), pg. 17.

The rationale for the proposed exception appears to be based upon concerns that derivative claims inure to the benefit of all shareholders, including, in some cases, those who have engaged in wrongdoing. Additionally, several courts have suggested that closely held corporations, in some cases, function more like a partnership than a corporate entity. See Galbreath v. Scott, 433 So.2d 454, 457 (Ala. 1983); Barth v. Barth, 659 N.E.2d 559, 562 (Ind. 1995); Donahue, 328 N.E.2d at 512; Meiselman v. Meiselman, 289, 307 S.E.2d 551, 557 (N.C. 1983).

Despite gaining some judicial acceptance over the past decade, the closely held corporation exception is not the majority rule and has been subject to criticism. Delaware,

17

for example, has yet to embrace the concept of a direct shareholder action in a closely held corporation. In Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 384 (7th Cir. 1990), the Seventh Circuit noted that under Delaware law a claim that a majority shareholder established a competing business should have been brought as a derivative suit rather than a direct one. The Court noted that, "[c]ommercial rules should be predictable; this objective is best served by treating corporations as what they are, allowing the investors and other participants to vary the rules by contract if they think deviations are warranted." Id.

We decline to adopt a closely held corporation exception to the rule requiring that suits for breach of fiduciary duty against officers and directors must be brought derivatively on behalf of the corporation and not as individual shareholder claims. Adherence to the general rule without this proposed exception prevents multiplicity of lawsuits by shareholders. A recovery by the corporation protects all shareholders as well as creditors. Finally, as expressed in Bagdon, consistent application of commercial rules promotes predictability. If shareholders and the corporation desire to vary commercial rules by contract, they are free to do so. Accordingly, the trial court did not err in striking the jury's verdict on Count 2.

Although striking the jury's verdict on Simmons'
individual claim for breach of fiduciary duty, the trial court
denied Miller's motion to strike the jury's verdict on
Simmons' derivative claim for breach of fiduciary duty.
Miller asserts that she was entitled to the benefit of the
statutory business judgment rule[3] codified at Code § 13.1-690,
which provides:

> A. A director shall discharge his duties
> as a director, including his duties as a
> member of a committee, in accordance with his
> good faith business judgment of the best
> interests of the corporation.

> B. Unless he has knowledge or
> information concerning the matter in question
> that makes reliance unwarranted, a director
> is entitled to rely on information, opinions,
> reports or statements, including financial
> statements and other financial data, if
> prepared or presented by:

> 1. One or more officers or employees of the
> corporation whom the director believes, in good

---

[3] Miller was sued in her capacity as "a director, officer and majority shareholder." By its express terms Code § 13.1-690 applies to directors only. As one commentator has noted, "[t]he General Assembly elected not to enact a statutory standard of conduct for officers. See Revised Model Act § 8.42. As a result, development of the standard of conduct for officers will be left to the courts." Allen C. Goolsby, Virginia Corporation Law and Practice § 9.7, n.62. However, in this case, the jury instruction on the business judgment rule was given without objection and made no distinction between Miller's various roles. It became the law of the case. See Rice v. Charles, 260 Va. 157, 169, 532 S.E.2d 318, 325 (2000). Additionally, on appeal, Simmons does not argue any theory of liability based upon Miller's status as majority shareholder.

faith, to be reliable and competent in the matters presented;

   2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or

   3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.

   C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.

   D. A person alleging a violation of this section has the burden of proving the violation.

Code § 13.1-690 applies to the "discharge [of] duties as a director," and makes no distinction between duties of care and loyalty. We recognized in Willard v. Moneta Building Supply, Inc., 258 Va. 140, 151, 515 S.E.2d 277, 284 (1999) that "Code § 13.1-690(A) does not abrogate the common law duties of a director." However, the protection of § 13.1-690(C) applies only to acts "taken as a director, or any failure to take any action," and is confined to the exercise of business judgment on behalf of the corporation. When the acts in question do not meet these criteria, Code § 13.1-690 does not apply.

The acts cited by Simmons as constituting Miller's breach of duty to Las Palmas include: "secretly organizing Las Palmas

20

International/Profesor Sila." Clearly, the organization of International, a competitor, was not a corporate act of Las Palmas. In taking this action, Miller was not exercising business judgment on behalf of Las Palmas. Although implicating a common law duty of loyalty, this act does not fall within the scope of Code § 13.1-690. Miller was not entitled to protection under the statutory business judgment rule.

The evidence viewed in the light most favorable to Simmons amply supports the jury's verdict that Miller breached her duty of loyalty to Las Palmas. Accordingly, the trial court did not err in refusing to set aside the jury's verdict on Simmons' derivative claim for breach of fiduciary duty against Miller.

B. Statutory Conspiracy under Code §§ 18.2-499 and -500.

The trial court set aside the jury's verdict on Simmons' individual claim of statutory conspiracy under Code §§ 18.2-499 and -500, adopting the same reasoning that led to denial of an individual claim for breach of fiduciary duty, namely that a derivative action is the sole means of redress for injury to the corporation. The trial court set aside the jury's verdict on Simmons' derivative claim of statutory conspiracy because the evidence was insufficient to support the verdict. We need not reach the question concerning

21

maintenance of an individual claim for statutory conspiracy because we agree with the trial court that the evidence was insufficient to support the verdict, whether brought individually or derivatively.[4]

The trial judge did not indicate in his opinion letter what deficiency in the evidence resulted in granting the motion to strike the jury verdict.  Code § 18.2-500 provides civil damages for violation of Code § 18.2-499.  In pertinent part, Code § 18.2-499 permits such liability where "[a]ny two or more persons . . . combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever."  In order to sustain a claim for statutory conspiracy under Code §§ 18.2-499 and -500, the plaintiff must prove by clear and convincing evidence that the conspirators acted with legal malice, that is, proof that the defendant acted intentionally, purposefully, and without lawful justification.  See Feddeman & Co. v. Langan Assoc., 260 Va. 35, 44, 530 S.E.2d 668, 673 (2000); Tazewell Oil Co. v. United Virginia Bank, 243 Va. 94,

---

[4] On appeal, Simmons' allegations of statutory conspiracy, whether individual or derivative, involve only conduct of Miller and Kear.  Neither Miller nor Kear argues that an attorney-client relationship existed between them, making it legally impossible for them to be found liable for statutory conspiracy; consequently, we do not reach that issue.

108, 413 S.E.2d 611, 619 (1992). Code §§ 18.2-499 and -500 do not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business. Advanced Marine Enterprises v. PRC Inc., 256 Va. 106, 117, 501 S.E.2d 148, 154 (1998); Commercial Business Systems, Inc. v. BellSouth Services, Inc., 249 Va. 39, 47, 453 S.E.2d 261, 267 (1995).

Clearly, the evidence is sufficient as to Miller to satisfy the requirement of showing that she acted intentionally, purposefully, and without lawful justification. But under Code §§ 18.2-499 and -500, it is also necessary to prove that Kear combined, associated, agreed, mutually undertook, or concerted together with Miller in such conduct.

Reviewing the evidence in the light most favorable to Simmons, the allegations concerning Kear's conduct include:

a. Kear and Miller were friends and godmothers to each other's children;

b. Kear's office was in the same building as the office of Las Palmas;

c. Kear provided a draft cross-purchase agreement to Miller and later edited the document;

d. Kear attended a contentious meeting between Miller and Simmons;

23

e. Kear signed and filed Articles of Organization for International and listed herself as organizer and registered agent;

f. Kear maintained an unsigned "Limited Liability Company Agreement for Las Palmas Tobacco International, L.L.C." in her files, listing Miller and Profesor Sila as equal owners; and

g. Kear edited a letter drafted by Miller to Simmons concerning valuation of Las Palmas.

Notably absent from the proof is any indication that Kear knew of Miller's conduct concerning the assets of Las Palmas. In his brief, Simmons declares that Kear "never inquired about the purpose of the new company." Simmons acknowledges that Miller told Kear that International had a different market than Las Palmas, namely, "Canada and the Pacific Rim," and that one of the purposes for creation of International was to facilitate a visa into the United States for Karim Bayzid. Simmons then complains that "Kear never inquired why Las Palmas Tobacco, Ltd. could not accomplish either objective." In these respects, Simmons proves too much and reinforces Kear's claim of lack of evidence to support a statutory conspiracy. Upon review of the facts of this case in the light most favorable to Simmons, we hold that the trial judge did not err in striking the derivative claim for statutory

24

conspiracy because the evidence was insufficient to support the claim.  Because the individual claim for statutory conspiracy depended upon identical proof, the trial judge did not err in also striking that claim.

## C.  Legal Malpractice

The jury returned a verdict against Kear on Simmons' derivative claim of legal malpractice; however, the trial court granted Kear's motion to strike the jury verdict because the evidence was insufficient as a matter of law.  It is axiomatic that in claims of legal malpractice the plaintiff bears the burden of proof that the attorney's negligence proximately caused the client's loss.  Hazel & Thomas, P.C. v. Yavari, 251 Va. 162, 166, 465 S.E.2d 812, 815 (1996).  "[I]f the evidence is such that reasonable minds could not differ as to the outcome, the issue of proximate cause should be decided by the court, not the jury."  Gregory v. Hawkins, 251 Va. 471, 476, 468 S.E.2d 898, 893 (1996) (citations and internal quotation marks omitted).  In the present case, the trial court observed, "it was not the formation of International that caused Simmons['] harm, but rather International's activities."  As recited in our discussion of the statutory conspiracy claims, the lack of proof of Kear's knowledge of or participation in the conversion of Las Palmas' assets is significant.  Although the standard of proof for a legal

25

malpractice claim is by a preponderance of the evidence, we hold that the trial judge did not err in striking the jury's verdict because the evidence was insufficient as a matter of law.

### D.  Breach of Employment Agreement — The Non-competition Clause

The jury rendered a verdict against Miller in favor of Simmons in his derivative capacity for breach of the non-competition clause in Miller's employment agreement with Las Palmas.  Miller assigns cross-error to the trial court's denial of her motion to strike the jury's verdict.  The clause in controversy provides:

> For a period of three (3) years after this termination or expiration of the Agreement, Employee shall not directly or indirectly, own, manage, control, be employed by, participate in, or be connected in any manner with ownership, management, operation, or control of any business similar to the type of business conducted by Employer at the time this Agreement terminates.

In Advanced Marine Enterprises, 256 Va. at 118, 501 S.E.2d at 155, we stated:

> To determine whether a non-competition agreement may be enforced, a chancellor must consider the following criteria:
>
> (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate business interest?

26

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

The employer bears the burden of proving that the restraint is reasonable under the facts of the case. Blue Ridge Anesthesia v. Gidick, 239 Va. 369, 371-72, 389 S.E.2d 467, 468-69 (1990). Because restrictive covenants restrain trade, non-competition clauses are strictly construed against the employer. Grant v. Carotek, Inc., 737 F.2d 410, 412 (4th Cir. 1984). Whether a restrictive covenant is enforceable is a question of law to be determined by the court. See Orkin Exterminating Co. v. Walker, 307 S.E.2d 914, 916 (Ga. 1983). The analysis of the three interrelated factors cited in Advanced Marine requires consideration of the restriction in terms of function, geographic scope, and duration.

Las Palmas imported one particular brand of cigars grown and manufactured in the Canary Islands. However, under the terms of the non-competition clause, the restricted function encompasses "any business similar to the type of business conducted by [Las Palmas]." The restricted function is considerably broader than Las Palmas' business activity.

The non-competition clause is without geographical limitation. Under its terms, Miller is prohibited from

27

engaging in the business of importing cigars anywhere in the world.  By contrast, Las Palmas had exclusive rights to import and distribute Profesor Sila cigars for the "east coast of the United States of America."  Finally, the three-year restriction upon competition in this agreement is a lengthy duration.

In determining the reasonableness and enforceability of restrictive covenants, trial courts must not consider function, geographical scope, and duration as three separate and distinct issues.  Rather, these limitations must be considered together.  We have previously found restrictive covenants lasting as long as three years to be reasonable under the circumstances of the particular case.  See Blue Ridge Anesthesia, 239 Va. at 374, 389 S.E.2d at 470; Roanoke Eng'g Sales Co. v. Rosenbaum, 223 Va. 548, 556, 290 S.E.2d 882, 887 (1982).  However, in this case, upon consideration of the lengthy duration of the restriction, the expansion of restricted functions, and the lack of any geographical limitation, we hold that the restrictive covenant was greater than necessary to protect the legitimate business interests of Las Palmas, and unduly harsh and oppressive in curtailing Miller's legitimate efforts to pursue her livelihood.  As an unnecessary and unreasonable restraint of trade, the non-competition clause is offensive to the public policy of the

Commonwealth and is not enforceable.  The trial court erred in refusing to set aside the jury's verdict against Miller for breach of the non-competition clause in her employment agreement with Las Palmas.

### E.  Conversion

The jury rendered a verdict against Miller in favor of Simmons in his derivative capacity for conversion of Las Palmas' assets.  Miller assigns cross-error to the trial court's denial of her motion to strike the jury's verdict.  A person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights.  See Hartzell Fan, Inc. v. Waco, Inc., 256 Va. 294, 300, 505 S.E.2d 196, 201 (1998); Bader v. Central Fidelity Bank, 245 Va. 286, 289, 427 S.E.2d 184, 186 (1993).

Viewed in the light most favorable to Simmons, there is ample evidence to support the jury's verdict on the claim of conversion.  Simmons presented evidence that Miller deprived Las Palmas of the use and value of its property, including the lease of office space, furniture, equipment, cash, and customer lists.  The trial court did not err in denying Miller's motion to strike the jury's verdict.

### VI.  Conclusion

29

With the exception of the trial court's failure to set aside the jury's verdict against Miller for breach of the non-competition clause of the employment agreement, we will affirm the judgment of the trial court.  We will reverse the judgment in favor of Simmons on Count 6 of the motion for judgment.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and final judgment</u>.