# CIRCUIT COURT OF THE CITY OF NORFOLK

John S. Devnew

v.

Flagship Group, Ltd.

December 29, 2006

Case No. (Civil) CH05-3173

By Judge Norman A. Thomas

On September 11, 2006, counsel presented oral argument and evidence on plaintiff's request that this court declare his employment agreement with Flagship Group, Ltd.[1] ("Flagship") unlawful, null, void, and unenforceable. Specifically, Devnew asks this court to declare that the employment agreement he signed in January 2001 with Flagship ("employment agreement") is unenforceable because the non-competition related restrictions in it are overbroad, exceeding the limitations reasonably necessary to protect Flagship's interests, are unnecessarily harsh and restrictive on Devnew's ability to earn a livelihood, and are contrary to Virginia public policy. During and after the trial, the Court received and reviewed the parties' briefs, depositions, and exhibits and has maturely considered Devnew's request for declaratory relief.

---

[1] Though Devnew signed the agreement in issue after Flagship became a wholly owned subsidiary of Brown & Brown, for the sake of clarity, and unless otherwise noted, the Court will refer to the agreement at issue as one between Devnew and Flagship.

## I. *Factual Background*

The court makes the following factual findings based upon the record before it.

The defendant, Flagship, is a full service insurance intermediary (agency/broker) offering a wide variety of commercial and personal insurance products, including property and casualty insurance for businesses[2] and individuals[3] and employee benefits.[4] (Joint Stipulation 1.) To round out its business, Flagship also writes a small number of surety bonds. *Id.*

Although Flagship sells to all types of customers, its market niche is with companies engaged in maritime commerce. *Id.* at 2. Flagship's primary source of revenue is the commissions it receives when it successfully places insurance coverage for its clients. The majority of Flagship's customers are located in the mid-Atlantic area but it also serves commercial customers throughout the world. *Id.* It services approximately 15% of the marine customer market in the New Jersey through North Carolina service area but also plays a small role in the national and international marine insurance industry. (Preliminary Hearing 175, 181.)

Flagship primarily works as a retail agent for insurance products, dealing directly with its customers to place insurance and does not underwrite risk. (Joint Stipulation 2.) Rather, it negotiates with the insurance underwriting company to place insurance. *Id.* In certain cases, the underwriters with whom Flagship has existing relationships are unwilling or unable to insure the specific risk that a Flagship client desires to cover. (Devnew's Proposed Findings 12.) Under those circumstances, Flagship will contact an insurance wholesaler or a managing general agent for purposes of locating an underwriter that is willing and able to issue the required policy. If Flagship is successful, an underwriter issues an insurance policy to Flagship's client and Flagship receives a portion of the premium that the client pays to the underwriter as a commission payment for Flagship's services. When Flagship goes through a managing general agent or an insurance wholesaler, Flagship shares the commission with the agent or wholesaler. *Id.*

---

[2] Flagship offers director's and officer's liability, errors and omissions, and employment practice liability insurance to its business clients.

[3] Flagship offers homeowners and automobile insurance to its individual clients.

[4] In its employee benefits practice, Flagship offers group life, health, and long term disability insurance.

The marine insurance industry is a relationship-driven business generated by professional contacts and knowledge of the industry, industry-related products, and specific vessels. (Joint Stipulation 4.) In fact, the most valuable asset of an insurance agency is its goodwill. (Trial 202.) Unlike a manufacturing company, largely dependent on capital investment, the value of an insurance agency is in its employees and its ability to utilize its employees' relationships to generate commissions. *Id.* at 203. Given this nature of the insurance business, brokers who have knowledge of the customer's operations, experience, existing coverage policy, expiration dates, and rate structure have a competitive edge to renew and generate new business with an existing client when the client's policy comes up for renewal. (Joint Stipulation 4.) Typically, Flagship's customers' renew their contracts on a yearly basis. (Joint Stipulation 18.)

In early 1994, Flagship lost much of its fishing vessel business to a competitor. *Id.* at 3. Shortly thereafter, Flagship's President, Stephen Johnsen, and its Executive Vice President, Robert O'Sullivan, met Devnew, who possessed some eighteen years of commercial fishing experience. (Devnew's Proposed Findings 2.) At that time, Johnsen told O'Sullivan that Devnew would make a good addition to Flagship's staff as an insurance producer because of his ability to relate well with those in the commercial fishing industry and his extensive knowledge of and relationships in that industry. Not long after their initial meeting, Johnsen sent Devnew an offer of employment to "Service, Develop, Market, Sell Marine insurance services and facilities to fishing vessel and other marine clients." *Id.* Devnew accepted Flagship's offer and signed a standard employment agreement, which included a confidentiality provision and a post-employment covenant not to compete for insurance business with Flagship's customers. (Devnew's Proposed Findings 3.)

When Flagship hired Devnew, he had no prior experience in the insurance field, yet he quickly learned the trade. (Flagship's Proposed Findings 5.) Within three months of starting his employment with Flagship, Devnew became licensed to sell property and casualty insurance in Virginia[5]

---

[5] Since the early days of his career in the insurance industry, Devnew has been licensed to sell all lines of property and casualty insurance in New Jersey, New York, Connecticut, Massachusetts, Maine, Rhode Island, Maryland, Florida, Delaware, Pennsylvania, Virginia, North Carolina, and Louisiana. (Joint Stipulation 3.) These licenses permit him to sell lines of insurance including: general liability, property, automobile, workers' compensation, director's and officer's liability, errors and omissions, employment practice liability, umbrella coverage, products liability, fiduciary, pollution and intellectual property. (Devnew Trial 111, Joint Stipulation 3.)

and shortly began working for Flagship as a Producer. (Joint Stipulation 3.) Producers are referred to interchangeably as "Account Executives," "Producers," or "Agents." Producers are typically certified to broker property and casualty lines of insurance. (Flagship Proposed Findings 2-3.) After taking maritime insurance courses and receiving on-the-job training and an initial book of business from Flagship, Devnew focused his efforts on insuring fishing vessels, concentrating on the marine insurance field and regaining lost clients. *Id.* Devnew successfully regained for Flagship several of the fishing vessel accounts it had lost and was able to grow Flagship's commercial fishing vessel portfolio. (Joint Stipulation 10.)

Although Devnew primarily sold fishing vessel policies, he also was responsible for several non-fishing vessel accounts and traditional property and casualty exposures for fishing vessel clients. (Preliminary Hearing 109-12, 144-45, Devnew Dep. 87-8, Trial 116-20.) To service his clients, Devnew spent forty to fifty percent of his time traveling outside of the Hampton Roads region. (Joint Stipulation 4.)

In November of 2000, Brown & Brown acquired Flagship's stock in exchange for six million dollars of its own stock. (Trial 198-99.) Much of the purchase price was for Flagship's goodwill, the relationships with its customers and carriers and its confidential client information. *Id.* at 199. After the acquisition, Johnsen, acting then as Executive Vice President of Brown & Brown and the Profit Center Manager of Flagship, requested that Devnew sign a new employment agreement. That draft agreement, *inter alia*, included a confidentiality provision, a post-employment covenant not to compete, and a section prohibiting the hiring away of Flagship employees. (Preliminary Hearing 97-98, Defendant's Exhibit 8.) Devnew refused to sign. *Id.*

Following a series of negotiations, Brown & Brown agreed to eliminate a restriction from competing with prospective customers and made several other changes to the draft agreement. (Preliminary Hearing 131-32.) Apparently, upon the advice of counsel that the restrictions were overly broad and unenforceable, Devnew signed the employment agreement sometime between January 11 and January 25, 2001, which contract was to remain effective through December 2002 unless Devnew died or terminated his employment without cause and gave thirty days notice. (Devnew's Proposed Findings 8, Joint Stipulation 5, Defendant's Exhibit 10, Plaintiff's Trial Exhibit 6 & 7.) After the termination or expiration of the Agreement, Devnew agreed in Section (1)(b) to continue to remain bound by the non-compete provisions of Sections 8, 9, and 10. (Defendant's Exhibit 10, Plaintiff's Trial Exhibit 6 & 7.) Thus, even upon signing the employment agreement at issue in

this proceeding and despite Brown & Brown's efforts to negotiate in good faith as to its terms, Devnew did not intend to be bound by the agreement's non-competition terms.

During the negotiations, Johnsen prepared and signed a document entitled "Employment Agreement: Addendum # 1" ("Addendum # 1"), which included language permitting Devnew to engage in "non-competitive business ventures such as selling fish." (Defendant's Exhibit 10, Plaintiff's Exhibit 7.) However, Devnew never signed Addendum # 1, nor did Johnsen ever even present it to Devnew for his review. (Flagship's Proposed Findings 10.) Rather, the final draft of the employment agreement that Devnew signed included a different addendum entitled "Addendum to Employment Agreement" ("Addendum # 2"), permitting Devnew to "engage in business ventures such as selling ventures so long as such ventures are not competitive." (Plaintiff's Exhibit 6.) Devnew reviewed the draft of Addendum # 2 and did not complain to Johnsen or any other Flagship or Brown & Brown personnel that Addendum # 2 should have included different non-competitive ventures language. *Id.*

Devnew's employment agreement, as supplemented by Addendum # 2, contains the following provisions, in pertinent part:

> 8(a) Employee recognizes and acknowledges that the Confidential Information (as hereafter defined) constitutes valuable, secret, special, and unique assets of Company. Employee covenants and agrees that, during the term of this Agreement and for a period of two (2) years following termination of his employment (whether voluntary or involuntary and whether before or after the expiration of the term of this Agreement), Employee will not disclose the Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose without the express written approval of Company and will not use the Confidential Information for Employee's own account or for the account of any person, firm, corporation, or entity except the Company. It is expressly understood and agreed that the Confidential Information is the property of Company and must be immediately returned to Company upon demand. The term "Confidential Information" includes all information, whether or not reduced to written or recorded form, that is related to Company and that is not generally known to competitors of the Company nor intended for general dissemination, whether

furnished by Company or compiled by Employee, including but not limited to (i) lists of the Company's customers, policy expiration dates, insurance carriers, Company accounts, and records pertaining thereto; and (ii) prospect lists, policy forms, marketing and/or rating information, information on risk characteristics, and information concerning insurance markets available to Company for large or unusual risks. Employee understands that it is Company's intention to maintain the confidentiality of this information notwithstanding that employees of Company may have free access to the information for the purpose of performing their duties with Company, and notwithstanding that employees who are not expressly bound by agreements similar to this agreement may have access to such information for job purposes. Employee acknowledges that it is not practical, and shall not be necessary, to mark such information as "confidential" nor to transfer it within the Company by confidential envelope or communication, in order to preserve the confidential nature of the information.

(b) For a period of two (2) years following termination of his employment (whether voluntary or involuntary and whether before or after the expiration of the term of this Agreement), Employee specifically agrees not to solicit, divert, accept, nor service, directly or indirectly, as an insurance solicitor, insurance agent, insurance broker, insurance wholesaler, managing general agent, or otherwise, for Employee's account or the account of any other agent, broker, insurer, or other entity, any insurance or bond business of any kind or character available from Flagship during Employee's employment with Flagship:

(i) From any person, firm, corporation, or other entity that is a customer or account of Flagship during the term of this Agreement, or. . . .

(c) The prohibited conduct under this section 8 shall include, without limitation, (i) the quoting of premiums or fees, (ii) the furnishing of policy expirations or underwriting or service information, (iii) the placing of insurance coverage, (iv) the sale of product(s), or (v) the provision of service(s), whether such activities result from actions initiated by a Flagship customer or by Employee. . . .

(j) The Company agrees that the Employee may engage in business ventures such as selling ventures so long as such ventures are not competitive, but the Employee shall first notify the Company in advance of engaging in such proposed activities. . . .

(9) Employee agrees that, so long as Employee is working for Company, Employee will not undertake the planning or organizing of any business activity competitive with the work Employee performs, that is, activity involving the sale of insurance services and products on behalf of any person or entity that is or will be competing with Company for business. Employee agrees that Employee will not, for a period of two (2) years following termination of his employment (whether voluntary or involuntary and whether before or after the expiration of the term of this Agreement), directly or indirectly solicit or seek to induce any of Company's employees to leave Company's employ to work for Employee or any other competitive company. Employee acknowledges and agrees that all activities under this Section 9 shall be presumed to be in aid of prohibited solicitation under the terms of Section 8 of this Agreement and shall justify injunctive relief as provided in Section 8.

(Plaintiff's Trial Ex. 6 & 7, Defendant's Exhibit 10.)

In the newly executed employment agreement, Devnew agreed to three restrictive covenants: (1) not to solicit Flagship's clients for a period of two years following the termination of his employment ("non-solicitation provision"), (2) not to competitively hire away Flagship's employees ("no-raiding provision"), and (3) not to reveal confidential information received while working at Flagship ("confidentiality provision"). Devnew challenges only the validity of the confidentiality provision of § 8(a) and non-solicitation provisions of § 8(b) and (c). Thus, the Court will not consider the validity of the no-raiding provision of § 9.

In January 2004, Brown & Brown promoted Devnew to the position of Profit Center Manager for Brown & Brown's Flagship office, replacing Johnsen. (Preliminary Hearing 33.) When he accepted the position, Devnew remained bound by the now-contested sections of the employment agreement. *Id.*

As Profit Center Manager, Devnew's management responsibilities increased. He was responsible for the overall profitability of the Flagship office and supervised all Flagship producers and staff. (Preliminary Hearing

106-08, 159, Devnew Dep. 87, Trial 137-38.) Devnew also met with other producers' customers when their accounts needed additional attention and helped those producers to generate new business. (Trial 104.)

As Profit Center Manager, Devnew also had much greater access to Flagship's and Brown & Brown's confidential information. He was privy to confidential information for all of Flagship's customers, possessed all employee compensation information, received a "blue book" detailing expenses for every Brown & Brown office, attended quarterly meetings for Brown & Brown's Executive Committee, and was considered an "insider" for purposes of Securities and Exchange Commission regulations. (Trial 146-49.)

On April 21, 2005, Brown & Brown terminated Devnew's employment. (Devnew's Proposed Findings Law 17.) Since that termination Devnew has self-imposed several restrictions on the type of work that he will accept. He has eliminated many of the opportunities that might be available to him in southeastern Virginia because he refuses to work for any insurance brokers that require him to sign a restrictive covenant preventing him from taking away with him any business that he generates. (Devnew Dep. 96, Trial 162.) Devnew also refuses to work for any large publicly traded company and is only willing to work for a company where he has a future opportunity to become an equity owner. (Devnew Dep. Atty Eyes Only 10-13, Devnew Trial 168.) He also refuses to pursue insurance sales in the non-marine sector of Hampton Roads or elsewhere. (Devnew Dep. Atty Eyes Only 10-13.) Nor will he solicit many of the potential marine insurance candidates for which Devnew admittedly is not restricted under the employment agreement. (Stipulation of Both Parties Set Forth in Devnew Dep. 121-23.)

Within weeks of Devnew's termination, the retail commercial insurance agency Maury Donnelly & Parr, Inc. ("Maury Donnelly") offered him employment as the Director of its Marine Division. (Joint Stipulation 5.) Devnew accepted the employment offer and continues to serve in that capacity today. *Id.* Maury Donnelly is headquartered in Baltimore, Maryland, and Devnew commutes weekly from his Virginia Beach home to an apartment in that area. *Id.*

## II. *Declaratory Rulings*

The Court rules that (1) the non-solicitation provision and the confidentiality provision in Devnew's employment agreement are valid and enforceable because both provisions are (a) sufficiently narrowly tailored to protect Flagship's legitimate business interests, (b) not unduly burdensome on

Devnew's ability to earn a living, and (c) not against public policy and (2) the executed employment agreement contains no scrivener's or typist's error or mutual mistake.

The Court will address each of the two covenants and the scrivener's error claim separately.

## A. *Non-Solicitation Provision*

The Court finds that the non-solicitation provision in Devnew's employment agreement is valid and enforceable because (1) Flagship narrowly tailored its language to address the company's legitimate interest in protecting itself against competition from Devnew in its actual business activities for a time period directly related to policy expiration cycles; (2) the agreement is not unduly burdensome on Devnew's ability to earn a livelihood because Devnew is free to engage in a plethora of property and casualty insurance business activities permitted by his current licensure and experience and to solicit anyone other than Flagship's current and immediate past customers for marine-related and other insurance lines; and (3) the agreement is not contrary to public policy because it neither imposes an unreasonable restraint upon trade nor represents an unconscionable contract or unreasonable adhesion contract.

The employer bears the burden of proving that a court should enforce restrictive covenants in a non-compete agreement because, in general, restrictive covenants represent disfavored restraints of trade. *Omniplex World Servs. Corp. v. US Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005). Courts construe any contractual ambiguities in favor of the employee and evaluate each non-compete agreement on its own merits, analyzing the contract's provisions in light of the nature of the business and employee involved. *Id.*

In enforcing a covenant not to compete, the Court strives to strike a balance between protecting an employee's right to secure gainful employment after the termination of his employment with his former employer's legitimate interest in protecting itself from the former employee's ability to use information learned during the course of his employment to its disadvantage. By signing a non-compete agreement, an employee agrees not to engage in activities that actually or potentially compete with his former employer. *Id.*

When reviewing the validity of a non-compete agreement, the Court considers the following:

> (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than necessary to protect the employer's legitimate business interests?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of sound public policy?

*Simmons v. Miller*, 261 Va. 561, 580-81, 544 S.E. 2d 666, 678 (2001). In examining the reasonableness of the restrictive covenant, a court must holistically evaluate the combination of the covenant's duration, function, and geographic reach. *Id.*

### 1. *Flagship's Business Interests*

From Flagship's standpoint, the non-solicitation provision in Devnew's employment agreement is sufficiently narrowly drafted to protect only its legitimate business interests in avoiding unfair competition. Devnew is prohibited only from solicit[ing], accept[ing], divert[ing], or servic[ing] business from Flagship's current insurance clients and those who were Flagship clients on or after January 1, 2001, for two years following his termination. These constitute valid competition-related goals. The Virginia Supreme Court never has held that restrictive covenants are *per se* invalid and unenforceable under all circumstances. *Modern Environments, Inc. v. Stinnett*, 263 Va. 491, 495, 561 S.E.2d 694, 696 (2002). Rather, the language of every non-compete agreement is considered in the context of the facts of the specific case. *Id.*

As an insurance agency, Flagship possesses an important interest in its goodwill, that is, its client relationships. *See e.g. Paramount Termite Control Co. v. Rector*, 238 Va. 171, 175, 380 S.E. 2d 922, 925 (1989) (client contact justified employer's use of non-compete agreement); *Stoneman v. Wilson*, 169 Va. 239, 246, 192 S.E. 816, 819 (1937) (non-compete agreements often upheld where salesmen, agents, canvassers, and other employers come into personal contact with their employer's customers); *Arrowhead Travel, Inc. v. Hinton*, 25 Va. Cir. 54, 55 (Lancaster Co. 1991) (employers have the right to protect their goodwill from misappropriation). Such an employer may lawfully protect its goodwill from unfair competition by an employee, especially when that goodwill constitutes its chief asset. The evidence establishes that Devnew had access to confidential information which, in the hands of a competitor, could lower the value of Flagship's business. Tom Riley, the Regional President of Brown & Brown, anecdotally noted that 97% of an insurance business's value is its employees and the relationships they had generated with

its clients. Flagship thus may protect its business from exploitation by Devnew, who routinely accessed much of its client-related confidential information.

The Court rejects Devnew's arguments that Flagship lacks a protectable interest in preventing him from soliciting former customers, customers with whom he had no contact, and from selling lines of insurance to Flagship's current customers that they have not yet purchased from Flagship. Devnew himself admitted that much of Flagship's marketing efforts are focused on recapturing former clients. Moreover, Devnew could use the knowledge he garnered from his position as Profit Center Manager to gain a competitive advantage on Flagship even for clients with whom he had no direct contact. Finally, one of Flagship's most fertile avenues of business growth is selling additional lines of insurance to current clients. Devnew easily could use his relationships with Flagship's clients and exploit information, such as policy expiration dates, to which he had access during his tenure at Flagship to compete with it to sell additional insurance lines to its current clients.

The Court turns next to evaluate the duration, function, and geographic reach of Devnew's non-solicitation provision.

Initially, the court finds the two-year term of the non-solicitation provision reasonable under the facts and circumstances of this case. This time period prevents Devnew from competing for Flagship's clients for two policy renewal periods, the time generally required to establish a relationship with a client. (Trial 203, Preliminary Hearing 179.)

To properly explore whether a non-solicitation provision is correctly tailored in functional terms, the court must consider the character of Devnew's employment. *Worrie v. Boze*, 191 Va. 916, 928, 62 S.E.2d 876, 882 (1951). When a former employee is in a position to acquire knowledge of his employer's business methods and trade secrets, information that would benefit a competitor and prejudice the employer's interests, the court has a strong reason to uphold an otherwise properly limited restrictive covenant. *Id.*, 191 Va. at 928, 62 S.E. 2d at 882.

Devnew was privy to confidential information for all of Flagship's customers and accounts, including their policy expiration dates, prior claims that impact their experience ratings, rate histories, pricing information, customer contacts, marketing strategies, structure of current coverage, and commissions charged to customers. (Flagship Proposed Findings 14.) Flagship considers such information valuable and, in the hands of a competitor, this knowledge could prejudice Flagship's competitive interests. Flagship's competitor could anticipate Flagship's clients' needs and undercut its prices. In *Meissel v. Finley*, the Court noted that, in the insurance field, the

knowledge of policy expiration dates is of "vital assistance to the agency in carrying on the insurance business." 198 Va. 577, 583, 95 S.E.2d 186, 190-91 (1956). This information "enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements." *Id.*, 198 Va. at 583, 95 S.E.2d at 191.

Even Devnew admitted that he could successfully use his knowledge of Flagship's pricing information to compete for Flagship's business by offering its clients lower prices. (Preliminary Hearing 67-68.) This is exactly the type of competition that Flagship sought to avoid by entering into an employment agreement with Devnew. After voluntarily entering into a contract for employment, Devnew cannot now claim invalid the very provisions described as the "essence of this Agreement." (Plaintiff's Exhibit 6, Section (8)(h).)

Devnew argues that the non-solicitation provision is of great breadth by emphasizing sentence structure. However, the court looks at the plain meaning of the language of the contract and does not find reasonable Devnew's strained interpretation. Devnew claims that, on its face, the non-solicitation provision prevents him from engaging in any work for non-competing employers if the employment involves quoting insurance premiums or fees, furnishing policy expirations or underwriting or servicing information, placing insurance coverage, selling insurance products, or providing related services. However, Devnew thus reads Section 8(c) out of context. In truth, the contractual language prohibits Devnew only from engaging in such activities when the conduct is directed toward a current Flagship customer or a former client from Devnew's recent employment tenure and involves insurance or bond business available from Flagship during that time.

Devnew also imputes great breadth to section 8(b), which prohibits him from acting as an "insurance wholesaler, managing general agent, or otherwise." He claims that this provision renders the non-solicitation provision overly broad because it prohibits him from working for non-competitive employers or in a non-competitive capacity. Yet, the plain language of the provision again reveals that he is restricted only from acting as an insurance wholesaler, managing general agent, or otherwise if he is actually competing with Flagship. Indeed, Devnew is not restricted from working with Flagship's customers as a managing general agent or insurance wholesaler *unless* he does so in an effort to compete with Flagship. Moreover, Devnew may work for any company, even a competitor of Flagship, so long as he is not engaging in activities competitive with Flagship for a current Flagship customer or a post-January 1, 2001, client.

Despite Devnew's attempts to characterize the non-solicitation provision as overbroad, the Court finds that the provision's function is appropriately tailored to withstand Devnew's attacks. The provision restricts him only from engaging in business activities that are actually competitive with Flagship. *See, Omniplex*, 270 Va. at 250, 618 S.E.2d at 342-43.

The non-solicitation provision contains no explicit geographic scope, however, it is implicitly limited to the geographic areas where Flagship's customers are located. Although Flagship has accounts all over the world, Devnew is not prohibited from engaging in the insurance business throughout the world. Rather, he simply may not solicit Flagship's customers regardless of location. In fact, Devnew could open an office nearby Flagship, soliciting, accepting, and servicing insurance for anyone who is not now a Flagship client nor was a recent former client. Devnew could even solicit Flagship's clients for insurance products unavailable from Flagship. Thus, the putative unlimited geographic scope of the non-solicitation provision in Devnew's employment contract passes judicial scrutiny.

### 2. *Devnew's Ability to Earn a Livelihood*

The non-solicitation provision does not unreasonably curtail Devnew's ability to earn a living. To determine whether a restrictive covenant is unreasonably harsh and oppressive on the employee, the court considers the personalities involved and the circumstances of the transaction. *Meissel*, 198 Va. at 583, 95 S.E. at 191. Initially, the court rejects Devnew's effort to characterize himself as a mere employee who lacked bargaining power against a large corporation. Indeed, respecting the employment agreement's non-solicitation and confidentiality provisions, Devnew personified a valued and knowledgeable employee who enjoyed meaningful and substantial bargaining power with Brown & Brown.

The record reveals that Devnew actively negotiated with Brown & Brown regarding now-contested provisions of the employment agreement. He possessed enough leverage to convince Brown & Brown to eliminate several standard terms from his contract. For example, at Devnew's insistence, Brown & Brown struck its standard restriction on soliciting prospective clients. Devnew also successfully negotiated certain terms into his employment agreement. For example, Brown & Brown agreed to not terminate Devnew without cause or else pay Devnew a guaranteed $120,000 annual salary for the two-year term of his employment agreement.

Since his termination, Devnew has not been unduly restricted in his ability to earn a livelihood. In fact, within one month of his termination Devnew secured employment with Maury Donnelly making a salary roughly

comparable to his Flagship guarantee. (Preliminary Hearing 113-4, Plaintiff's Exhibit 7.) Under his agreement, Devnew enjoys nearly boundless opportunities to develop new business in Hampton Roads and elsewhere in the marine insurance niche or any other line of insurance business within his licensure. He simply may not engage Flagship's current or recent former customers in activities actually competitive with Flagship. Devnew made the personal choices to relocate to Maryland and to decline to work for publicly held local agencies or agencies that might require him to sign a non-compete agreement. Given that Devnew had substantial bargaining power with Brown & Brown and the fact that he possesses plentiful occupational avenues within his licensure and experience, the Court holds that Devnew's employment agreement does not unduly restrict his professional employment.

### 3. *Public Policy Considerations*

The non-solicitation provision in Devnew's employment agreement causes no appreciable loss to the public's interest in an open and competitive insurance marketplace. Moreover, public policy favors freedom of contract, *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir. 1987) (applying Virginia law in part), and the enforcement of valid contracts, *Meissel*, 198 Va. at 584, 95 S.E.2d at 191. Indeed, Devnew's agreement not to solicit Flagship's current and past customers in a highly competitive industry causes no appreciable loss to the public, since Flagship's current and past customers remain free to do business with a multitude of other agencies. With some four million dollars in annual revenue, Flagship garners only one hundredth of one percent of the forty billion dollar insurance market. (Trial 210.) Significantly, as a result of his aversion to restrictive covenants, Devnew places greater restrictions on his own business activities than does the agreement. From the totality of the facts of this case, the Court finds that the non-solicitation provision of this agreement does not violate sound public policy.

As noted above, enforcing the provision actually furthers the public policy interest in favor of lawful contracts. The insurance industry is highly dependent on personal contacts and affiliations. An insurance agency's value rests largely in its people. Flagship lawfully may protect its investment in its people from former employees' unfair competition by entering into properly crafted agreements with its employees. Moreover, in light of Devnew's ability to negotiate the terms of the agreement, even though the agreement represents a marginal restraint of trade, it does not constitute an unconscionable contract or a contract of adhesion. Public policy considerations do not justify a judicial intervention in this case.

## B. *Confidentiality Provision*

The court finds the language of the confidentiality provision sufficiently narrow to survive judicial scrutiny. The court evaluates the validity of confidentiality provisions of an employment agreement using the same standards as for a non-solicitation provision. *See, e.g., Totten v. Employee Benefits Management, Inc.*, 61 Va. Cir. 77 (Roanoke City 2003) (contractual non-disclosure provision is reasonable where no greater than necessary to protect the employer's legitimate business interests, not harsh and oppressive in preventing employee from earning a living, and not in restraint of trade or violative of public policy). Prohibiting disclosure of confidential business information is a legitimate commercial interest. *Id.* As the Profit Center Manager of Flagship, Devnew had access to a tremendous amount of information regarding Flagship's and Brown & Brown's sales activities. Having accepted that position and substantial compensation to fulfill the roles of Executive Vice President and Profit Center Manager, the scope of the confidentiality agreement's language does not exceed the legitimate business interest of Flagship, nor does it unduly restrict Devnew's ability to use his insurance license to secure gainful employment, or otherwise so interfere with the public's entitlement to a vibrant and competitive insurance market place as to violate Virginia's public policy.

## C. *Scrivener's Error*

The Court also rejects Devnew's claim that it should reform Devnew's employment agreement because it contained a scrivener's error. There exists no evidence of a typographical or clerical error constituting a mutual mistake. A court may reform a contract because of scrivener's error only when the contract contains a typographical or clerical error that results in mutual mistake. *Westgate at Williamsburg Condo. Ass'n, Inc. v. Philip Richardson Co.*, 270 Va. 566, 621 S.E.2d 114 (2005). Devnew attempts to characterize the term "selling ventures" in subsection 8(j) of the executed employment agreement as a scrivener's error that should have read "selling fish." Yet, the record does not provide proof of such a clerical or typographical error. In fact, Devnew and his counsel had ample opportunity to review drafts of this provision and never suggested any changes to the final language adopted in the agreement. Not only is there no evidence of mutual mistake to support a reformation of the agreement, this particular provision in the agreement only serves to buttress Flagship's arguments in favor of enforceability of the restrictive covenants. It explicitly permits Devnew to engage in ventures not competitive with Flagship.

## III. *Conclusion*

In conclusion, Devnew's employment agreement is valid and enforceable because each of the contested restrictive covenants is narrowly tailored to further Flagship's legitimate business interest in protecting its goodwill, is not unreasonably harsh or oppressive in curtailing Devnew's ability to earn a livelihood, and does not violate public policy. Moreover, Devnew's executed employment agreement does not contain any scrivener's error requiring the Court to reform it.