UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JONATHAN F. SCHUPP,
　　　　　　　*Plaintiff-Appellant,*

v.

JUMP! INFORMATION TECHNOLOGIES,
INCORPORATED,
　　　　　　　*Defendant-Appellee.*

No. 02-1157

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CA-00-2822-WMN)

Argued: December 4, 2002

Decided: February 7, 2003

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Jason Maxey Schupp, Ellicott City, Maryland, for Appellant. Guy Sterling Neal, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Andrew W. Stern, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., New York, New York, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant Jonathan Schupp filed an action against Appellee Jump! Information Technologies, Inc. ("Jump!") asserting several claims arising from the acquisition of Jump! by Logistical Design Solutions, Inc. ("LDS").[1] The parties filed cross-motions for summary judgment on all of Schupp's claims. The district court granted Jump!'s motion, denied Schupp's motion, and entered an order awarding judgment to Jump! on all of Schupp's claims. Schupp appeals that order. We affirm based substantially on the reasons set forth in the opinion of the district court.

I.

In June 1999, Schupp accepted an employment offer to serve as Vice President of Sales for Jump!, a closely held Virginia corporation. In addition to a base salary plus sales commissions, Schupp's compensation package included options to purchase up to 78,000 shares of Jump! series A, class B non-voting stock at 25 cents per share. Schupp's stock purchase options were scheduled to vest in three stages: an option to purchase 50 percent of the 78,000 shares was to vest in Schupp's first year of employment, and 25 percent was to vest in each of his second and third years of employment.

In September 1999, Schupp exercised his option to purchase 50 percent of the shares, _i.e._, 39,000 shares of Jump! stock. At 25 cents

_____

[1]Schupp named Jump! as the defendant in the action. Because Jump! no longer exists in the wake of the acquisition, LDS stepped in to litigate as successor-in-interest. Depending on whether the claim at issue involves conduct occurring before or after the acquisition, we will refer to the defendant-appellee as either Jump! or LDS, respectively. Technically, however, Jump! and LDS are one and the same.

per share, the purchase price was $9,750. At the time Schupp exercised his first option, the only other Jump! shareholders were William Engle, Jump!'s chief executive officer, Allan Von Dette, the chief financial officer, and Jeffrey Beardsley, the chief technical officer, each of whom owned 700,000 series A, class A voting shares.

Before Schupp's remaining options vested, LDS entered into negotiations with Engle and Von Dette to acquire Jump!. Schupp learned of the proposed acquisition in October 1999 and met with Engle and Von Dette to discuss his options regarding his shares of Jump! and his unvested options to purchase additional shares. First, Engle and Von Dette offered to buy back the 39,000 shares owned by Schupp at 39 cents per share (for a total of $15,210), which, according to Engle and Von Dette, was a premium given that Schupp exercised his option to purchase the shares at a price of 25 cents per share only a few months earlier. Second, Engle and Von Dette told Schupp that he could convert his unvested options to purchase an additional 39,000 shares of Jump! stock into options for 4,286 LDS shares, which was an equivalent exchange based upon a value of $2.28 per share of LDS stock. Finally, LDS offered Schupp employment as an account executive at the same salary and commission rate he received in his position with Jump!. Schupp agreed to these terms and executed agreements to sell his shares back to Jump! and to exchange his unvested Jump! stock purchase options for LDS stock purchase options. Schupp also decided to accept the job offered to him by LDS. The fourth and final Jump! shareholder, Beardsley, declined to join LDS and sold his interest — 700,000 shares of Jump! voting stock — back to Jump! for only 25 cents per share.

Having obtained all of the outstanding Jump! shares, Engle and Von Dette then transferred all of these shares to LDS for $525,000 in cash and 109,500 shares of LDS stock, which had by then increased in value to $2.60. During their discussions with Schupp about his options, Engle and Von Dette did not reveal to Schupp the fact that they had been offered employment contracts as regional managers for LDS or provide any of the details of that arrangement.

Schupp did not remain at LDS very long, voluntarily leaving his employment on January 21, 2000. At the time of his resignation, Schupp received a letter from LDS indicating that LDS owed Schupp

$6,250 in unpaid commissions. However, LDS retained $4,500 of the unpaid commissions, which was the amount LDS paid Schupp as a "retention bonus" to induce him to remain with LDS after the acquisition.

During Schupp's time at LDS, the company offered incentives to Schupp and the other employees for recruiting quality employees. To that end, LDS sent an e-mail to its employees stating that "[n]ext week, LDS will sponsor two special internal job fairs . . . designed to 'Build the Team with Friends and Family.' This is a great opportunity to introduce your qualified non-LDS colleagues and family members to one of the hottest . . . companies around . . . . If LDS hires your referral, you will receive a $3,000 bonus. . . . We will extend offers or declinations within 48 hours of the two fairs. . . . Stay tuned for more details." J.A. 165. Schupp invited Brian Cassidy to the job fair in December 1999.[2] LDS subsequently hired Cassidy in March 2000; LDS refused to pay the $3,000 bonus because Schupp was no longer working for LDS.

Believing that he was still owed money for commissions and bonuses and that Engle and Von Dette had not dealt fairly with him in connection with the stock transaction, Schupp filed an action against Jump! in Maryland state court. He asserted five claims against Jump!: (count 1) Jump! breached its contract to pay Schupp the bonuses and commissions he earned; (count 2) Jump! misrepresented and concealed information relating to the value of Schupp's shares and the terms of the acquisition of Jump! by LDS; (count 3) a constructive trust should be imposed upon the 78,000 shares that Schupp owned or had an option to purchase; (count 4) Jump! was unjustly enriched when it acquired Schupp's shares because of the misconduct of corporate officers acting on behalf of Jump!; and (count 5) Engle and Von Dette, as directors acting on behalf of Jump!, breached fiduciary duties owed to Schupp and caused him to suffer damages "through the sale and forfeiture of [Schupp's] rights in Jump! for an amount far less than any fair value of those rights." J.A. 11. Jump! removed the case to district court. The district court was presented

---

[2]Schupp invited two other candidates who were later hired by LDS. On appeal, Schupp is only pursuing his claim for a referral bonus based upon the employment of Cassidy.

with cross motions for summary judgment on each of Schupp's five causes of action. The court denied Schupp's motions, granted Jump!'s cross-motions, and entered an order awarding summary judgment to Jump!.

## II.

### A. *Count I*

Schupp alleged in his complaint that LDS "breached its contract to pay bonuses and commissions to Mr. Schupp despite his fulfillment of all conditions under the bonus and referral programs." J.A. 10. Moreover, Schupp contended that LDS's failure to pay him these amounts allegedly due violated the Maryland Wage Payment and Collection Law. *See* Md. Code Ann., *Lab. & Empl.* § 3-501-509 (1991).

Following his resignation from LDS, Schupp received a post-termination letter indicating that LDS owed him $6,250 in sales commissions. This letter noted, however, that under terms agreed to by Schupp, he was required, "as a result of [his] resignation," to refund to LDS a $4,500 retention bonus he received when he agreed to remain with LDS after the acquisition. J.A. 182. LDS subtracted the retention bonus from the $6,250 in commissions and concluded that "in light of our offer with the stock options, . . . these two items [should be considered] a wash." J.A. 161. During the course of this litigation, LDS paid Schupp $1,750 — the difference between the commissions due and the retention bonus.[3] On appeal, Schupp raises the same arguments he made below: that he was not required to refund the retention bonus but that, even if he was, LDS violated the Maryland wage payment law by offsetting this amount against commissions Schupp had earned.

Schupp was paid a retention bonus pursuant to a letter, dated November 10, 1999, that Schupp received when he agreed to remain

---

[3]As this action proceeded through discovery, LDS took the position that it was mistaken in its initial assessment of the amount of sales commissions owed to Schupp, and that he was entitled to less. The district court, however, concluded that Schupp was owed $6,275.88 at the time of his termination. LDS has not challenged this conclusion on appeal.

with LDS after the acquisition. As incentive for Schupp to remain with LDS after the acquisition, the letter offered a retention bonus of $4,500:

> The retention program will have two payments. The first will occur upon completion of the acquisition when each eligible employee will receive (30% of retention bonus/indiv). All eligible employees will receive the first payment. The second payment of (70% of the retention bonus/indiv) will occur on Nov 30, 1999. To receive the second payment the eligible employee must be continuously employed, on a full-time basis, by [LDS] through Nov 30, 1999. If an eligible employee chooses to leave [LDS]'s employment before May 1, 2000, he/she will be required to refund the full payment amount to [LDS] at the time their employment ends.

J.A. 199. The district court rejected Schupp's argument, concluding that "full payment amount" referred to the full retention bonus, not merely the second, partial installment of the retention bonus as Schupp contended.

The district court also rejected Schupp's position that LDS acted in contravention of the Maryland wage payment law by unilaterally withholding this amount from the commissions owed to Schupp. Although the district court noted its view that the wage payment statute did not apply, it assumed for analytical purposes that the statute did apply, and the court held that Schupp gave his written consent to the withholding when he signed the letter explaining the retention bonus. *See* Md. Code Ann., *Lab. & Empl.* § 3-503.

According to Schupp, LDS also owed him a $3000 bonus for recruiting Brian Cassidy as a new employee. Schupp's contention is based on the e-mail sent by LDS notifying its employees of an opportunity to earn a referral bonus through two "internal job fairs." J.A. 165. Schupp invited Brian Cassidy to the job fair in December 1999. LDS later hired Cassidy in March 2000, after Schupp was no longer employed by LDS.

LDS indeed had a referral program in place in 2000, pursuant to which employees could earn a total of $3000 for recommending a

candidate who was "subsequently hired as a full-time employee." J.A. 188. This amount accrued in three installments paid "through payroll in $1000 increments at three, six and nine months from the candidate's date of hire provid[ed] both the candidate and the referring employee are still [on] staff at LDS." J.A. 188. LDS presented affidavit testimony that the offer set forth in the e-mail was made under the terms of the 2000 referral program. Although Schupp argues that the e-mail offer stood alone, he points to nothing in the record — other than the e-mail itself — to contradict this evidence. The e-mail, however, was not inconsistent with the referral program. The district court concluded that Schupp was not entitled to any referral bonus for Cassidy because Schupp was no longer employed at LDS when Cassidy was hired.

Having conducted a de novo review of Schupp's claims regarding the referral and retention bonuses, we affirm for the reasons stated in the opinion of the district court. We also agree with the district court's observation that the Maryland wage payment law does not apply and conclude that count one of the complaint fails for that reason as well. Accordingly, we affirm the district court's award of summary judgment to LDS on Schupp's contract and wage payment claims.

B. *Counts II-V*

The remaining claims can be considered together as essentially a single claim. Schupp alleges that Jump!, as a corporate entity, is liable to him for breach of fiduciary duty as a result of the actions of Von Dette and Engle, who were directors, officers, and majority shareholders. Specifically, Schupp contends that Von Dette and Engle owed him a fiduciary duty which they breached by misrepresenting or failing to disclose material facts about the acquisition of Jump! by LDS. According to Schupp, he was not fully informed of all of the relevant information when he agreed to cash out his equity interest in Jump!. The parties agree that Virginia law applies to this claim.

The district court assumed for the sake of analysis that, under Virginia law, a closely held corporation itself, as opposed to its officers or directors, owes a fiduciary duty to an individual minority shareholder. Although we need not decide here whether Virginia law so provides, we note our doubts that a shareholder can maintain an

action for breach of fiduciary duty directly against the corporation itself. *See Radol v. Thomas*, 772 F.2d 244, 258-59 (6th Cir. 1985); *Jordan v. Global Natural Res., Inc.*, 564 F. Supp. 59, 68 (S.D. Ohio 1983). Virginia law may permit an individual shareholder to bring an action for breach of fiduciary duty *against the directors or officers* of a closely held corporation, *see Byelick v. Vivadelli*, 79 F.Supp.2d 610, 625 (E.D. Va. 1999), but we see no indication Virginia courts would permit such an action directly against the corporation.[4]

The district court concluded that Schupp's claims failed as a matter of law for two reasons: (1) Schupp failed to demonstrate that material facts were misrepresented to or concealed from Schupp; and (2) Schupp did not suffer financial loss as a result of any alleged breach of fiduciary duty.

First, Schupp contends that he was induced to cash out his equity interest in Jump! by Von Dette's and Engel's representation that Jump!'s bid to repurchase Schupp's 39,000 shares at 39 cents per share ($15,210) offered him a premium since Schupp had paid only 25 cents per share ($9,750) a few months earlier. Schupp complains that since Von Dette and Engle received almost 39 cents per share for their own shares, Schupp really received no premium at all. Schupp's position largely ignores the fact that Beardsley, Jump!'s chief technical officer, cashed his shares out at only 25 cents per share, and that the other three shareholders, including Beardsley, held *voting* shares while Schupp held *nonvoting* shares. In view of these facts, the district court rejected Schupp's contention that Von Dette's and Engle's statement that Jump!'s offer was at a premium constituted a material misrepresentation. On appeal, Schupp points to nothing in the record suggesting that he was promised more per share than the other three shareholders. Accordingly, we agree with the district court for the reasons stated in its opinion.

---

[4]This case is not controlled by *Simmons v. Miller*, 544 S.E.2d 666, 675 (Va. 2001), which rejects the proposition that a shareholder can bring an individual action *on behalf of the corporation*, rather than a derivative suit, for breach of fiduciary duties by a director. Schupp's claims are based on alleged individual injuries, not injuries to Jump! as a corporate entity.

Next, Schupp contends that Von Dette and Engle breached their fiduciary duties to Schupp by failing to disclose the terms of their own employment agreements with LDS. Essentially, Schupp claims that had he been aware of the generous employment terms Von Dette and Engle stood to gain through the acquisition — or lose if it failed — he "would likely have taken a very hard look at the sufficiency" of the consideration he received for his interest in Jump!. Brief of Appellant at 25. The district court rejected this contention as speculative since Schupp failed to offer any evidence to support a conclusion that he received less than fair consideration for his shares or that Von Dette or Engle would have offered more.

We agree with the conclusion of the district court for the reasons stated in its opinion. Moreover, it is implicit in Schupp's argument that, because LDS's acquisition of Jump! was contingent upon Von Dette and Engle acquiring all outstanding shares, including Schupp's, Schupp could have caused complications by refusing to sell. Thus, Schupp suggests that Von Dette and Engle might have been willing to pay more to ensure the success of the acquisition. However, Schupp had the ability to disrupt the acquisition regardless of the terms of employment between Von Dette and Engle. As the district court noted, this fact should have been apparent to Schupp since the stock purchase agreement he signed indicated that his sale of Jump! stock was contingent upon the sale of Jump! to LDS and referred specifically to the stock purchase agreement between LDS and Von Dette and Engle (which, in turn, explained that the acquisition was contingent upon Schupp's selling his shares).

Finally, Schupp contends that he was not provided sufficient information to make a truly informed choice regarding his unvested Jump! stock options. Essentially, Schupp asserts that Von Dette and Engle failed to disclose that Schupp's remaining Jump! stock options would vest as a result of the acquisition. He suggests that if he had been adequately informed, he would not have agreed to terminate his Jump! stock options in exchange for LDS stock options. Rather, he would have exercised his option to purchase the remaining 39,000 Jump! shares and cashed them out immediately.

Schupp's original stock option agreement with Jump! provided in part as follows:

If:

(A) [Jump!] should (i) merge or consolidate with another corporation or entity under circumstances where [Jump!] is not the surviving corporation or entity . . .

and

(B) as a result of [such a merger] . . ., [Schupp] shall fail to receive a bona fide offer of employment with power and authority analogous to [Schupp's] title and/or office prior to the merger . . .

then 100% of such [stock] Options not yet vested shall immediately vest . . . .

J.A. 97. Thus, Schupp knew, or should have known, that if LDS did not extend to Schupp an offer of employment for a position similar to the one he held at Jump!, then Schupp's stock options vested immediately. Nevertheless, he agreed to exchange his Jump! stock options for LDS stock options, apparently without attempting to learn whether he would receive such an offer.

Schupp's failure-to-disclose argument, at bottom, is based on the fact that Von Dette and Engle knew prior to the acquisition that LDS intended to offer Schupp a position carrying the title of "Account Executive." According to Schupp, Von Dette and Engle also knew that this new position would not be equivalent to his position at Jump! and that, as a result, Schupp's shares would vest immediately upon the completion of the acquisition. Schupp concludes that their failure to disclose all of this was a breach of their fiduciary duties to him.

The district court rejected this claim as well, concluding that the two positions were analogous in terms of power and authority and that any differences could be attributed to the much larger size of LDS. The record contains sworn testimony from the chief financial officer of LDS that Schupp was hired to perform the same business development job he performed at Jump! at the same level of compensation and that the two positions were roughly the same in light of the

size disparity between the two companies. Schupp points to nothing in the record, other than unsworn discovery responses, to contradict this. Moreover, there is nothing in the record to suggest that Von Dette and Engle believed these positions were not roughly equivalent — in fact, both men attested to their belief that the positions were the same. Accordingly, we affirm the award of summary judgment to Jump! on this basis as well.[5]

### III.

For the reasons stated above, we affirm the decision of the district court.

*AFFIRMED*

---

[5]In light of our foregoing conclusions, we do not reach the district court's alternative basis for summary judgment that Schupp suffered no financial loss.